**In re James M. DeLEON Supervising Judge, Philadelphia Municipal Court Philadelphia County.**

**No. 1 JD 06.**

Court of Judicial Discipline
of Pennsylvania.

July 27, 2006.

Before SPRAGUE, P.J., HALESEY, CAPOFERRI, O'TOOLE and MUSMANNO, JJ.

### OPINION AND ORDER

OPINION BY Judge SPRAGUE.

We have before us Respondent's Motion to Dismiss based on the Judicial Conduct Board's alleged violation of its Rule 31 (J.C.B.R.P. No. 31). That rule provides:

**RULE 31. DISPOSITION OF COMPLAINT.**

(A) Except as provided in paragraph (C), within 180 days of the Board's receipt of the Judicial Officer's written response pursuant to Rule 30(B)(2)(c) or written response to any subsequent letter requesting information by the Board, the Board shall:

(1) dismiss the complaint upon a finding that there is no existing probable cause to file formal charges;

(2) dismiss the complaint with the issuance of a letter of counsel upon a determination that, even if the alleged conduct occurred, it was not conduct which requires that formal charges be filed, provided that the Judicial Officer:

  (a) consents in writing;

  (b) stipulates that the letter of counsel may be used during proceedings involving new complaints against the Judicial Officer; and

  (c) agrees to and satisfies any conditions required by the Board; or

(3) authorize the filing of formal charges with the Court of Judicial Discipline.

(B) If the Board dismisses a complaint following a full investigation, Chief Counsel shall promptly notify the Judicial Officer and the complainant.

(C) Exceptions.

(1) The Board may continue a full investigation of a matter beyond the 180–day period set forth in paragraph (A) upon a good faith belief that further investigation is necessary.

(2) The Board may defer disposition of a complaint pursuant to paragraph (A) upon discovery or receipt of additional, corollary, or cognate allegations which may necessitate an investigation.

(3) The receipt of the Judicial Officer's written response to any Rule 30(B) notice or supplemental or investigatory letter is a necessary prerequisite to the tolling and calculation of the 180–day period set forth in paragraph (A). Thus, the 180–day time period is wholly inapplicable if the Judicial Officer fails to file a written response and the investigation will continue to conclusion.

The Board's rule-making power derives directly from the Constitution:

The Board shall ... establish and promulgate its own rules of procedure.

Pa. Const., Art. V, § 18(a)(6). It is pursuant to this constitutional authority that the Board established and promulgated its Rule 31.

■ In similar fashion this Court receives its rule-making power from the Constitution:

The court shall adopt rules to govern the conduct of proceedings before the court.

Pa. Const., Art. V, § 18(b)(4). It is pursuant to this constitutional authority that this Court adopted Rule 411(D)(3). That rule provides:

(D) The Judicial Officer may challenge the validity of the charges on any legal ground including:

\* \* \* \*

(3) that the Board violated the proceedings governing it.

C.J.D.R.P. No. 411(D)(3).

■ In *In re Hasay*, 546 Pa. 481, 686 A.2d 809 (1996), the Judicial Conduct Board took the position that this Court did not have constitutional authority or jurisdiction to review the Board's compliance with its own rules of procedure. In that case we held that this Court did have such authority. *In re Hasay*, No. 2 JD 95, slip op. at 5 (Pa.Ct.Jud.Disc. May 10, 1995). On appeal our Supreme Court met the issue head-on stating:

The board claims that the court does not have the constitutional authority or jurisdiction to review the board's compliance with its own rules of procedure, but may only determine whether there is clear and convincing evidence of ethical misconduct. The board's position on this issue is radical: the board's decisions concerning probable cause to file formal charges with the Court of Judicial Discipline are non-reviewable by that or any other court. The board's brief states:

To the extent that C.J.D.R.P. No. 411(D) provides that "the Judicial Officer may challenge the validity of the

charges on any legal ground including ... (3) that the Board violated the procedures governing it," it is clearly unconstitutional since the Court of Judicial Discipline's rule-making authority is limited to adopting rules which govern the conduct of the hearings before it. Furthermore, there is no authority, either in the Constitution or in the Rules of Conduct for District Justices, for the proposition that a violation of the Board's Rules should constitute a defense to formal charges. The opinion of the Court of Judicial Discipline stated: "Contrary to the Board's position that this Court's only function is to determine whether to impose a sanction, ... part of [that decision] may include, where relevant, an inquiry into the question of whether the Board has followed the rules it has adopted for its own governance." Slip op. at 5, May 10, 1995.[1]

\* \* \* \*

We emphatically reject the assertion that the board's compliance with its rules of procedure is absolutely beyond judicial review. The rules exist in part to insure that due process is accorded judicial officers subject to investigation and prosecution by the board. The constitution states that all hearings before the Court of Judicial Discipline shall be "conducted pursuant to the rules adopted by the court and in accordance with due process." Pa. Const. Art. V, § 18(b)(5).

\* \* \* \*

We therefore hold that the rules of the Court of Judicial Discipline properly include reference to the board's compli-

---

**1.** We repeat here an additional observation made by this Court in the *Hasay* opinion of May 10, 1995:

If the Board were not subject to review by this Court to determine whether it has com-

plied with its rules, the rules, and the constitutional provision directing the adoption of the rules would be meaningless. *Id.* at 4.

ance with its rules as an issue subject to the review of the court.

The discipline of a judicial officer is a process which begins the moment a complaint is received by the board. The judicial officer is entitled to due process at all stages of the proceeding before the board, the court, and on appeal. A denial of due process by the board may be remedied by the court or on appeal. Every minor or technical violation of the board's rules may not be a denial of due process, and the appropriate remedy may be a minor matter; nonetheless, the guarantee of due process requires that the board's procedures be reviewable. The court's rule of procedure 411(D)(3), allowing an accused judicial officer to challenge the board's procedural integrity, is a valid exercise of the court's rule-making authority, and is perfectly in keeping with the constitutional mandate that the court conduct its hearings "in accordance with the principles of due process." [2]

*Hasay, supra,* at 493–95, 686 A.2d at 816–17.

The matter is, thus, solidly settled, and it is upon this authority that we here examine the Board's compliance—or non-compliance—with its Rule 31.

At the outset we note that the Board, with commendable candor, has conceded that, in this case, it did not comply with the rule. (N.T. 14). Notwithstanding, giv-

en that the Board's concession is based upon, and limited to, the facts of this case—as will be our decision—it is important that those facts be here set out.

Under Rule 31 the 180 day clock begins to run when the Board receives the judicial officer's written response to the Board's Notice of Investigation. In this case that response was received on June 6, 2003.[3] Based upon Stipulations of Fact agreed to by the parties and upon Respondent's exhibit R–3, items 14–72, we find that the Board's investigation proceeded as follows:

— from June 6, 2003 to August 20, 2003 no investigation was conducted;

— from August 20, 2003 to March 2004 numerous witnesses were interviewed and depositions were conducted;

— no investigation was conducted from March 2004 until June 2004 when several witnesses were interviewed;

— except for one interview in August 2004, no investigation was conducted from June 2004 until October 14, 2005 when Respondent's deposition was taken;

— thereafter, no further investigation was conducted and the Board authorized filing of a Complaint in this Court on December 5, 2005.

Since the Board's investigation was not complete at the expiration of 180 days, and since by that time the Board had not done

---

**2.** The Judicial Conduct Board made this argument one more time in *In re Cicchetti,* 697 A.2d 297, 308–09 (Pa.Ct.Jud.Disc.1997) respecting its alleged non-compliance with its Rule 15 (forbidding the Board's consideration of complaints more than four years old unless the acts were part of a "pattern" of misconduct or the Board had "good cause" to consider them). In that case, following *Hasay,* we held that "reviewing the Board's compliance with its Rule 15 is a matter within our purview—indeed it is our duty . . . ."

**3.** It is common, and it would be expected, that some investigation will have preceded the Board's notification of the judicial officer; our record, however, does not contain information as to how long that investigation had been underway. In any event, the 180 day requirement of Rule 31 is not triggered until the judicial officer files his written response to the Notice, which, in this case, was June 6, 2003.

any of the things required of it under Rule 31(A)(1), (2) or (3), i.e., dismiss the complaint, issue a letter of counsel, or authorize the filing of formal charges with this Court, on December 8, 2003, proceeding under Rule 31(C)(1), the Board authorized an extension of the investigation beyond the 180 day limit. Board counsel has filed a Certification that at that time the Board had "a good faith belief that further investigation was necessary." We do not question the factuality of that certification nor do we question the propriety of the extension authorized on December 8, 2003.

However, the Board interprets the "Exceptions" clause of Rule 31(C)(1) to require formal extensions be made every 180 days and that each extension be supported by the aforementioned "good faith belief that further investigation is necessary." Acting accordingly, the Board authorized additional extensions of 180 days on May 3, 2004, December 6, 2004 and June 13, 2005. While we may not be constrained to question the existence of "good faith belief" that on those dates "further investigation was necessary," our examination of the Board's compliance with Rule 31 does not end there.

It is a given that the intention of Rule 31 is to require that the Board conduct its investigations with some expedition, that it not dawdle along all the while leaving the judicial officer under investigation to wonder whether he will be facing formal charges or not. It follows that this requirement cannot be met, nor this goal achieved, without the concomitant requirement that the Board proceed with diligence in conducting its investigations. Our review of the Board's compliance with Rule 31 will not be complete, then, without an examination of that question.[4]

From the above timeline we note:

1. that the Board's investigation extended over a period of 2½ years (from June 6, 2003 to December 5, 2005)[5];

2. that, except for one interview in August 2004, and the deposition of Respondent in October 2005 the Board did nothing from June 2004 until December 2005—a period of 1½ years.

■ We believe that such lengthy, unexplained delay such as occurred in this case, coupled with an egregious lack of diligence on the part of the Board such as is present in this case,[6] which results in prejudice to the Respondent, can only be remedied by dismissal of the charges.[7]

We note that, in this case, the Board lengthened the time it has prescribed for

---

4. Similar inquiry, i.e. whether the Commonwealth acted with due diligence, is part of the process in determining whether the 180 day rule and the 365 day rule of Pennsylvania Criminal Rule of Procedure No. 600 has been complied with. See, Pa.Crim.R.P. No. 600(G), and *Commonwealth v. Williams,* —— Pa. ——, 896 A.2d 523 (2006); *Commonwealth v. Murray,* 879 A.2d 309 (Pa.Super.2005); *Commonwealth v. Meadius,* 582 Pa. 174, 870 A.2d 802 (2005); *Commonwealth v. Hunt,* 858 A.2d 1234 (Pa.Super.2004).

5. In actuality the Board's investigation was longer than this because, as mentioned earlier, it is highly probable that some (not insub-stantial) investigation preceded the Board's notice to Respondent.

6. Again, the Board has candidly acknowledged that it did not act with diligence in this case. (N.T. 72).

7. The Supreme Court of the United States, in considering an alleged violation of a criminal defendant's right to a speedy trial under the Sixth Amendment to the United States Constitution, though recognizing the serious consequences of dismissing the indictment, stated that "it is the only possible remedy." *Barker v. Wingo,* 407 U.S. 514, 522, 92 S.Ct. 2182, 2188, 33 L.Ed.2d 101, 112 (1972).

completion of investigations from 180 days to 900 days, and that for 540 days it did nothing (save for one interview).

We recognize that on each of the four occasions when it authorized extension of the investigation, the Board would have had "a good faith belief that further investigation was necessary" as required by its Rule 31(C)(1). This would always be so because, by failing to do things that needed to be done, there always was something that needed to be done. Thus, if so interpreted, the exception of Rule 31(C)(1) could operate to extend an investigation indefinitely, and, so, would effectively cancel the 180 day rule and render nugatory the purpose, the intention, and the policy out of which it arose. We hold that where the Board's "good faith belief that further investigation is necessary" is attributable to the Board's lack of diligence the "good faith belief" is contrived and should not operate to nullify the rule.

We emphasize that in cases where violation of Rule 31 is alleged and dismissal of the charges is sought, the delay must have resulted in prejudice to the Respondent, and the burden is on the Respondent to establish prejudice. However, there can come a time in a given case where the delay is so lengthy that prejudice can be presumed.[8] We do not here specify what that length of time is or may be in any case—save this case. We hold that in this case the delay was such that prejudice may be presumed.

In addition to the presumption, the record in this case contains evidence that the long delay did actually prejudice Respondent in his ability to prepare and present his side of the case. He testified that three individuals who were closely associated with his campaigns in 2001, 2002 and 2003 and who might have been able to testify in support of Respondent's contentions that he personally made no efforts and had no knowledge of any efforts to raise campaign funds in violation of Canon 7 of the Code of Judicial Conduct as charged by the Board, died in June 2005, October 2005 and January 2006. (N.T. 82–98). Respondent also testified that there were some "character witnesses" he would have liked to have called to vouch for his reputation but they died in 2006. (N.T. 97–102).

On the basis, then, of the inordinate length of time which elapsed after receipt of Respondent's response to the Notice of Investigation until the Board's authorization to file charges, which was due to the Board's lack of diligence, in violation of Board's Rule 31, and the actual prejudice to Respondent shown to have resulted from the passage of such a long time, we order that the Board's Complaint be dismissed.

O'TOOLE, J., files a dissenting opinion.

SANDLER and LAMB, JJ., did not participate in the consideration of this opinion.

---

**8.** Essentially, this is what Rule 600 of the Pennsylvania Rules of Criminal Procedure accomplishes by establishing the 180 and 365 day rules (Rule 600(A)(2) and (3) for incarcerated and unincarcerated defendants respectively). *In Barker v. Wingo, supra,* the Supreme Court of the United States adopted a "balancing test" for determining violations of the speedy trial provision of the Sixth Amendment of the United States Constitution but stated: "Nothing we have said should be interpreted as disapproving a *presumptive rule* adopted by a court in the exercise of its supervisory powers which establishes a fixed time period within which cases must normally be brought." *Id.,* at 530 n. 29, 92 S.Ct. at 2192 n. 29, 33 L.Ed.2d at 115 n. 29 (emphasis added). The Pennsylvania Supreme Court did just that when it promulgated what is now Criminal Rule of Procedure 600. *See, Commonwealth v. Hamilton,* 449 Pa. 297, 297 A.2d 127 (1972).

PANEPINTO, J., did not participate in the consideration or disposition of this case.

DISSENTING OPINION BY Judge O'TOOLE.

I dissent from the Court's decision to dismiss the Complaint in this case because I disagree that prejudice to the Respondent should be "presumed," and because I believe the Court's finding that actual prejudice was established in this case, was improvidently made. Put another way, I believe that a finding of actual prejudice is essential to support dismissal of the charges for violation of Judicial Conduct Board Rule 31 and I believe that that finding should only be made—can only properly and fairly be made—in the context of the totality of the evidence, and should not be made, as it was in this case in a separate proceeding held preliminary to the trial. Moreover, I disagree with the Court's finding that actual prejudice was established.

I am also troubled by this Court's interpretation of Board Rule 31 by which it "writes in" a requirement that the Board proceed with "due diligence" and "writes out" the exception contained in subsection (C) of Rule 31 which permits the investigation to be extended beyond the 180 day limit set out in subsection (A) of Rule 31. Thus, it seems to me, the Court is rewriting Rule 31, and I dissent because I believe that to be outside of our constitutional function.

I will discus the last point first.

## I. *INTERPRETATION OF RULE 31.*

Judicial Conduct Board Rule 31 provides in pertinent part:

**RULE 31. DISPOSITION OF COMPLAINT.**

(A) *Except as provided in paragraph (C)*, within 180 days of the Board's receipt of the Judicial Officer's written response pursuant to Rule 30(B)(2)(c) or written response to any subsequent letter requesting information by the Board, the Board shall:

(1) dismiss the complaint upon a finding that there is no existing probable cause to file formal charges;

(2) dismiss the complaint with the issuance of a letter of counsel;

\*    \*    \*    \*    \*    \*

(3) authorize the filing of formal charges with the Court of Judicial Discipline.

\*    \*    \*    \*    \*    \*

(C) Exceptions.

(1) The Board may continue a full investigation of a matter beyond the 180–day period set forth in paragraph (A) upon a good faith belief that further investigation is necessary.

(2) The Board may defer disposition of a complaint pursuant to paragraph (A) upon discovery or receipt of additional, corollary, or cognate allegations which may necessitate an investigation.

(3) The receipt of the Judicial Officer's written response to any Rule 30(B) notice or supplemental or investigatory letter is a necessary prerequisite to the tolling and calculation of the 180–day period set forth in paragraph (A). Thus, the 180–day time period is wholly inapplicable if the Judicial Officer fails to file a written response and the investigation will continue to conclusion (emphasis added).

As can be seen, the Board did not include the words "due diligence" in the rule. The Court, however, declaring that "it is a given" that the Board "conduct its investigations with some expedition," concludes

that compliance with Rule 31 requires that it proceed with "due diligence."[1] While the requirement of subsection (A) that the Board finish its investigations in 180 days may support the idea that the Board wished that its investigations be conducted with "some expedition"; the requirement of "due diligence" is a different and separate idea, and the Board did not include it in the rule. It could have; but it didn't. This Court now does. In doing so, I think we exceed our authority.

Next, the Court uses the "due diligence" requirement which it has engrafted on the rule to nullify the exception of subsection (C) by which the Board excepted itself from compliance with the 180 day requirement if it had "a good faith belief that further investigation is necessary." The Court concedes that each time the Board extended the investigation it, in fact, had a good faith belief that further investigation was necessary, and thus the condition specified by the plain language of subsection (C)(1) was met. Nevertheless, employing the bootstrapped "due diligence" requirement, the Court declares that the Board's [admitted] "good faith belief" was "contrived" and thus invalid to extend the investigation.[2] No consideration is given to the possibility that the Board, having placed itself on a tight schedule to begin with, determined that if extensions needed to be had in order to execute its constitutional mandate, they should be had.

The Court appears to justify its action on the basis of what it determines the Board was trying to accomplish when it put Rule 31 in place. But the Court nullifies what the Board was trying to accomplish by subsection (C)(1) when the Board provided that an extension should be had whenever it needed to be had. It must be remembered that this is the Board's rule: the Board wrote the rule and if the Board wanted to "effectively cancel the 180 day rule"[3] that is the Board's prerogative.[4]

The Court says that if Rule 31(C)(1) is to be interpreted to permit extensions whenever necessary that will "render nugatory the purpose, the intention, and the policy out of which [Rule 31] arose."[5] But that is only if the Court's version of the purpose, intention, and policy of the rule is the same as the Board's. We don't know that; and I am unwilling to join in the order dismissing these charges for non-compliance with Rule 31 when it is clear—and admitted—that the Board was compliant with the plain language of the rule. In my view, the Court is rewriting the rule to say what the Court thinks it should say so that it will serve the purpose the Court thinks it should be serving. As stated earlier, I believe that is not our constitutional function and I must respectfully dissent.[6]

1. Majority Opinion, p. 1031.

2. Majority Opinion, p. 1032.

3. Majority Opinion, p. 1032.

4. The Board was not obliged to adopt this rule in the first place; and it is, of course, free to change it or eliminate it.

5. Majority Opinion, p. 1032.

6. I am not unmindful that, at the hearing in this case, counsel for the Board conceded that there had been a violation of Rule 31 (N.T. 13–14). There is no doubt, however, that this Court is not bound by an opinion of Board counsel on the question whether there has been compliance or non-compliance with one of the Board's rules. This is a matter for this Court to determine. This is our constitutional mandate. The majority opinion pertinently cites the holding of our Supreme Court in *In re Hasay*, 546 Pa. 481, 495, 686 A.2d 809, 817 (1996):

> We therefore hold that the rules of the Court of Judicial Discipline properly include reference to the board's compliance with its rules as an issue subject to the review of the court.

## II. *PRESUMPTION OF PREJUDICE.*

As stated earlier, I disagree with the majority's decision that prejudice to the Respondent should be presumed. The reasons for my disagreement are as follows.

There are two situations in which the courts of this Commonwealth have considered whether a presumption of prejudice is satisfactory to justify dismissal of a case. One is on the civil side on a motion for non pros. The other is on the criminal side where dismissal of the charges is sought for violation of a defendant's constitutional right to a speedy trial. Neither the civil cases nor the criminal cases provide support for the introduction of a presumption of prejudice in cases in this Court on Motions to Dismiss For Non–Compliance With Board Rule 31.

In civil cases, the Supreme Court of Pennsylvania has definitively ruled that prejudice *may not* be presumed to support a judgment of non pros. It is instructive, I think, to examine the road the Supreme Court traveled in coming to that decision.

For many years the law of Pennsylvania on the subject was as had been laid down by the Supreme Court in *James Brothers Lumber Co. v. Union Banking and Trust Co.*, 432 Pa. 129, 247 A.2d 587 (1968) where the Court said:

> A Court may properly enter a judgment of non pros when a party to the proceeding has shown a want of due diligence in failing to proceed with reasonable promptitude, and there has been no compelling reason for the delay, and the delay has caused some prejudice to the adverse party . . . .

*Id.* at 132, 247 A.2d at 589.

Twenty-four years later, in *Penn Piping, Inc. v. Insurance Company of North America*, 529 Pa. 350, 603 A.2d 1006 (1992) the Supreme Court, Zappala, J., dissenting, reversed the Superior Court which, following *James*, had held that, in order to support a non pros, actual prejudice had to be shown. The Supreme Court reversed that holding and declared:

> [W]e now hold that in cases involving a delay for a period of two years or more, the delay *will be presumed prejudicial* for purposes of any proceeding to dismiss for lack of activity on the docket (emphasis added).

*Id.* at 356, 603 A.2d at 1009.

In 1998, the Supreme Court, unanimous now, decided the case of *Jacobs v. Halloran*, 551 Pa. 350, 710 A.2d 1098 (1998) and reversed the holding of *Penn Piping* set out above, stating:

> This appeal raises significant issues regarding the standard applicable to the dismissal of a case for inactivity pursuant to a defendant's motion for non pros. For the reasons set forth herein, we hold that the equitable principles underlying the entry of a judgment of non pros must be recognized and the pre-

This mandate to review is not circumscribed—compliance or non-compliance is the question. And this Court has just as much right to find that the Board *did* comply with its rules in a case where the Board says it *didn't* as it does to find that the Board *did not* comply with its rules in a case where the Board says it *did*. Indeed, it is more than our right—it is our duty. As we said, following *Hasay:*

> We therefore find that reviewing the Board's compliance with its Rule 15 is a

matter within our purview—indeed, it is our duty . . . .

*In re Cicchetti*, 697 A.2d 297, 308 (Pa.Ct.Jud. Disc.1997).

This duty, then, is not discharged if the Court considers itself "bound" by the opinion of a party and for that reason does not itself review the question of compliance or non-compliance; nor is it discharged if the Court "defers" to the opinion of a party and for that reason does not itself review the question of compliance or non-compliance.

sumption of prejudice first enunciated in *Penn Piping, Inc. v. Insurance Company of North America,* 529 Pa. 350, 603 A.2d 1006 (1992), *must be abandoned* (emphasis added).

*Id.* at 352, 710 A.2d at 1099–1100.

Thus, the Court returned the law to what it had been under *James, supra,* and considered that action to be important enough to warrant reversing its prior holding. Thus, the majority's decision to employ a presumption of prejudice in this case finds no support in the law of Pennsylvania governing dismissal of civil cases for lack of activity.

The criminal cases are different; for one thing, they involve a constitutional right [7] and different forces are in play. These forces are identified by the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) where the Court pointed out that:

> [T]here is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused. The inability of courts to provide a prompt trial has contributed to a large backlog of cases in urban courts which, among other things, enables defendants to negotiate more effectively for pleas of guilty to lesser offenses and otherwise manipulate the system. In addition, persons released on bond for lengthy periods awaiting trial have an opportunity to commit other crimes.... Moreover, the longer an accused is free awaiting trial, the more tempting becomes his opportunity to jump bail and escape. Finally, delay between arrest and punishment may have a detrimental effect on rehabilitation.

---

7. This right is the right to a "speedy trial" guaranteed by the Sixth Amendment of the

*Id.* at 519–20, 92 S.Ct. at 2186–87, 33 L.Ed.2d 110–11. The Court pointed out other considerations which underlie the speedy trial right:

> If an accused cannot make bail, he is generally confined ... [which] contributes to the overcrowding and generally deplorable state of those institutions. [And] lengthy exposure to these conditions "has a destructive effect on human character and makes the rehabilitation of the individual offender much more difficult." ... [And] lengthy pretrial detention is costly.... [And] society loses wages which might have been earned, and it must often support the families of incarcerated breadwinners.

*Id.* at 520–21, 92 S.Ct. at 2187, 33 L.Ed.2d at 111.

Review of these considerations which bear on, and account for, the right to a speedy criminal trial, quickly reveals that none are germane to proceedings instituted by the Judicial Conduct Board under the 1993 amendments to Article V of the Pennsylvania Constitution; nor do they provide a rationale for "speedy investigations" by the Judicial Conduct Board; nor do they provide a rationale for dismissal of charges for "violation" of Judicial Conduct Board Rule 31 in the absence of a showing of actual prejudice.

In *Barker v. Wingo,* the Supreme Court adopted a "balancing test" to be used in the federal courts for determining whether the right to a speedy trial was infringed in any case; but allowed that:

> Nothing we have said should be interpreted as disapproving a presumptive rule adopted by a court in the exercise of its supervising powers which establishes a fixed time period within which cases must normally be brought.

United States Constitution, and by Article I, Section 9 of the Pennsylvania Constitution.

*Barker v. Wingo, supra,* at 530 n. 29, 92 S.Ct. at 2192 n. 29, 33 L.Ed.2d at 115 n. 29. The majority points out that, pursuant to that footnote, the Supreme Court of Pennsylvania promulgated Rule 600(A)(2) and (3) of the Pennsylvania Rules of Criminal Procedure which establish the presently existing 180 and 365 days rules for incarcerated and unincarcerated defendants respectively. These rules provide that incarcerated defendants shall be admitted to bail after the expiration of 180 days and charges against all defendants shall be dismissed after the expiration of 365 days. Inasmuch as Rule 600 is a "presumptive rule," such as referred to in *Barker, supra*—meaning that it is "presumed" that a defendant's right to a speedy trial has been denied after the specified time—the majority appears to take that rule as support for its decision that prejudice should be "presumed" in some cases in this Court.

The connection is not there. Respectfully, I point out that Rule 600 was ordained for use in criminal cases only, to protect a *constitutional* right, and was based upon all the elements referred to in *Barker* which bear on the necessity for "speedy trials" in criminal cases. These elements do *not* bear on the necessity for "speedy trials" in cases in this Court which have to do with the preservation of the integrity of our judicial system.

With no intention of diminishing the benefits of examining the law of Pennsylvania in civil and criminal cases, I point out that proceedings in this Court are neither "civil" or "criminal" (nor "quasi-criminal," for that matter)—they are *sui generis.*

The Pennsylvania Supreme Court has characterized these proceedings as "quasi-criminal"; but that leaves unanswered the question: are they "criminal" *enough* to require the adoption of a presumption of prejudice requiring the dismissal of charges for non-compliance with Board Rule 31? For example, in *Matter of Chiovero,* 524 Pa. 181, 570 A.2d 57 (1990) the Pennsylvania Supreme Court said:

> Proceedings held before the Board [JIRB] have been held to be quasi-criminal in nature, *Matter of Dandridge,* 462 Pa. 67, 337 A.2d 885 (1975), and *we have never held that a respondent-jurist before the Board is not clothed with the fundamental constitutional rights available to criminal defendants* (emphasis added).

*Id.* at 189, 570 A.2d at 61.

But, in *Dandridge, supra,* the Supreme Court said:

> A disciplinary proceeding such as this is constitutionally labeled as "quasi-criminal." ... *There is no requirement however to grant the full panoply of constitutional rights available to a criminal defendant* (emphasis added).

*Id.* at 74, 337 A.2d at 889.

A more meaningful approach to determination of the character of these proceedings is that taken by the Supreme Court in *Office of Disciplinary Counsel v. Campbell,* 463 Pa. 472, 345 A.2d 616 (1975), and *In re Berlant,* 458 Pa. 439, 328 A.2d 471 (1974). In *Campbell* the Court adopted the reasoning of the 7th Circuit in *In re Echeles,* 430 F.2d 347 (7th Cir.1970), quoting from the opinion in that case as follows:

> [D]isbarment and suspension proceedings are neither civil nor criminal in nature but are special proceedings, sui generis, ... They are not for the purpose of punishment, but rather ... to protect the courts and the public from the official ministration of persons unfit to practice.

*Id.* at 349.

In *In re Berlant, supra,* the Supreme Court similarly observed:

Disciplinary proceedings are not criminal in nature; hence, the reasonable doubt standard need not apply. Moreover, the sanctions arising from such proceedings—censure, suspension, or disbarment—are not primarily designed for their punitive effects, but for their positive effect of protecting the public and the integrity of the courts from unfit lawyers.

*Id.* at 441, 328 A.2d at 473.

I am hard put to appreciate the urgency of constructing a *presumption* of prejudice in cases brought before this Court for alleged violations of Board Rule 31. The majority's attention to the interests of judicial officers under investigation is certainly understandable, and appropriate in all circumstances; but we must also be cognizant of the constitutional duties of the Judicial Conduct Board. I think both interests are better served by requiring a showing of actual prejudice.

As I said, I see no urgency for creating a presumption of prejudice in this case for the reasons set out above; however, in addition, I am afraid some undesirable side-effects will follow if we do. These include:

1. Difficulty in managing cases where prejudice is presumed. Justice Zappala called attention to this in the *Jacobs* opinion when he wrote of the difficulties experienced by the courts during the six years of the regnancy of the *Penn Piping* rule which had established a presumption of prejudice in civil cases where non pros was sought for lack of activity. The Justice wrote:

[A]s a result of defining a period after which prejudice is automatically presumed, the practical application of this equitable doctrine has become enigmatic. There has been a lack of consistency in the lower courts as to whether the presumption is rebuttable and, if so, what type of evidence is required. This indicates to us that the application of the presumption has proved to be unworkable.

*Jacobs v. Halloran, supra,* at 358, 710 A.2d at 1102–03.

2. Engagement of the Court's time and resources contending with such esoteric concepts as "excludable time," "excusable delay" and, "run dates" ("mechanical run date," "adjusted run date") a labor which the trial and appellate courts of this Commonwealth regularly perform in applying and implementing Rule 600 of the Pennsylvania Criminal Rules of Procedure. *See, e.g., Commonwealth v. DeBlase,* 542 Pa. 22, 665 A.2d 427 (1995); *Commonwealth v. Malgieri,* 889 A.2d 604 (Pa.Super.2005); *Commonwealth v. Murray,* 879 A.2d 309 (Pa.Super.2005); *Commonwealth v. Hunt,* 858 A.2d 1234 (Pa.Super.2004) (*en banc*), appeal denied, 583 Pa. 659, 875 A.2d 1073 (2005); *Commonwealth v. Corbin,* 390 Pa.Super. 243, 568 A.2d 635 (1990).

3. Engagement of the Court's time and resources in overseeing the investigations of the Judicial Conduct Board to assure that the Board has conducted them with "due diligence." This will necessitate evidentiary hearings such as are the everyday occupation of the Courts of Common Pleas in their endeavors to correctly apply Rule 600. In addition to *DeBlase, Malgieri, Murray, Hunt* and *Corbin,* cited above, *see, also, Commonwealth v. Meadius,* 582 Pa. 174, 870 A.2d 802 (2005).

4. The proliferation of motions alleging non-compliance with the Judicial Conduct Board's Rule 31. The filing of the majority opinion will introduce the [justifiable] perception that, in a given case, the necessity to establish actual prejudice may be dispensed with. We can only expect that that [justifiable] perception will lead to the

filing of Rule 31 motions in the hope that each particular case is such "a given case."

For these reasons, whatever is accomplished by the majority's decision to presume prejudice here, I see as coming at a high price—a price which I believe this Court should not—and need not—pay. The interests of judicial officers who see themselves prejudiced by lengthy investigations, are fully protected by the equitable doctrine of laches.[8]

I mention one other point.

I call attention to Judicial Conduct Board Rule of Procedure No. 2(C). That rule provides in pertinent part:

## RULE 2. RULES OF CONSTRUCTION.[9]

(A) As used in these rules, unless the context otherwise requires:

\* \* \* \* \* \*

(C) An error or defect of procedure shall not confer any substantive rights on any party.

Since we are here engaged in reviewing and interpreting a Board rule, it is often useful—and always advisable—to see if there are other rules which shine light on, e.g., its intended application (broad or narrow), or the consequences of a violation. Thus, it is appropriate to give attention to Rule 2.

If there was an "error or defect" here, i.e., if there was a non-compliance with Rule 31 of the Judicial Conduct Board's *Rules of Procedure*, it was an "error or defect of *procedure*" and the plain words of the Judicial Conduct Board, author of Rule 2, specify that such an error or defect "shall not confer any substantive rights on any party." It seems to me that dismissal of the charges is vindication of a substantive right. If Rule 2(C) is not meant to be applied in the event of the Board's noncompliance with the procedure it prescribed for itself in Rule 31—to limit the consequences thereof, I cannot imagine when it would ever apply. Such an inter-

---

**8.** Laches will remain an issue in this case if this Court were to dismiss the Motion To Dismiss For Non–Compliance With Rule 31. *See, Weinberg v. State Board of Examiners of Public Accountants*, 509 Pa. 143, 501 A.2d 239 (1985); *Shah v. State Board of Medicine*, 139 Pa.Cmwlth. 94, 589 A.2d 783 (1991); *Lyness v. State Board of Medicine*, 127 Pa. Cmwlth. 225, 561 A.2d 362 (1989).

These cases all stand for the proposition that: The equitable defense of laches is available against the Commonwealth in an administrative disciplinary proceeding by a licensing board. However, the court *"will require a stronger showing by a defendant who attempts to apply the doctrine against the Commonwealth* than by one who would apply it against an individual."* (emphasis added).
This is another reason why I cannot join with the majority, for its dismissal for non-compliance with Board Rule 31 dispenses with the benefit to which other Commonwealth agencies are entitled, i.e., the requirement of a "stronger showing" of lack of diligence on the

part of the agency. This creates an illogical and unnecessary disparity between the Judicial Conduct Board and all other Commonwealth agencies. I do not believe the drafters of the 1993 amendments to Article V intended that judicial officers charged with crimes or other violations of the Code of Judicial Conduct or of the Constitution should have an advantage over physicians and accountants in defending against such charges. There is little question in my mind that our Supreme Court would be dissatisfied with a scheme where the Judicial Conduct Board, established by the Constitution, was to be treated with less deference than other agencies which owe their existence, not to a constitutional enactment, but to a legislative enactment.
*Shah, supra*, at 128–29, 589 A.2d at 800, citing *Weinberg, supra*, at 150, 501 A.2d at 243, and *Lyness, supra*, at 240, 561 A.2d at 369–70.

**9.** These Rules of Construction are obviously intended for general application, i.e., to govern the construction of all the Board's Rules of Procedure, including Rule 31.

pretation of Rule 2(C) would be at variance, then, with those basic rules of construction which instruct courts to presume that the author of a rule does not intend a result which is absurd or unreasonable, and does intend that the *entire* rule be effective.[10]

The majority ignores this rule. By doing so, the majority is again rewriting the Board's rules; but this time it is not merely adding or subtracting words, it is subtracting an entire rule. This is outside of our constitutional authority and for this additional reason, I must, respectfully, dissent.

### III. *THE HEARING AND THE EVIDENCE.*

#### A. The Hearing

The hearing on the question of prejudice was conducted on May 22, 2006. Respondent was the only witness, and his testimony essentially consisted in his identification of three individuals, now deceased, who, Respondent said, knew that he, Respondent, did not know that the so-called "Minority Committee"[11] was raising money for Respondent in violation of Canon 7 and that Respondent did not know that his name was associated with the "Minority Committee." (N.T. 80–117).

The assignment of this Court if this case ever went to trial would be to determine whether the Judicial Conduct Board had carried out its constitutional assignment of establishing, by clear and convincing evidence, that the conduct of Respondent was, as charged in the Complaint, a violation of Canon 7. At the trial, Respondent would present his defense. At that time, he could (and presumably would) present testimony that his ability to present a defense was actually prejudiced by the Board's non-compliance with Rule 31.[12] I think it fair to say that at the trial the testimony on this point would be the same as was presented at the hearing of May 22, 2006.[13] I believe that it is only then that this Court can conduct a realistic evaluation of Respondent's evidence so as to enable it to make an adequately informed decision on the question of actual prejudice.[14] I believe it is only then, when the Court has received all of the Board's evidence and all of the Respondent's evidence, that the Court can tell whether the prejudice to Respondent was such that compels dismissal of the case.

If some may argue the point, I daresay there can be no argument that it would be *better* to decide the question against the background, and in the context of, all of the evidence. Once again, I fail to see the compulsion to decide the question preliminarily.

#### B. The Evidence

The Respondent was the only witness, and I must say, that I regard his testimony largely, if not wholly, inadmissible. If it is admissible, then it commands a large measure of skepticism. Moreover, coming, as it did, at a preliminary hearing, it was

---

**10.** *See* 1 Pa.C.S.A. § 1922(1) and (2) and *Rossi v. Commonwealth,* 580 Pa. 238, 860 A.2d 64 (2004).

**11.** Alleged by the Judicial Conduct Board to have been a bogus committee—a "front"— organized solely to "get around" the provisions of Canon 7 of the Code of Judicial Conduct which prescribe the earliest time a judicial candidate may raise campaign funds.

**12.** This testimony would also be pertinent to the defense of laches.

**13.** At the trial the Respondent might even present more—and better—evidence.

**14.** When laches is the issue, the issue is joined at, and resolved after, trial. *See, e.g., Weinberg, Shah,* and *Lyness, supra.*

realistically guaranteed that the Board would be hard put to rebut it, or even challenge it.[15]

As stated earlier, Respondent's evidence consisted in Respondent's testimony of what was in the mind, first of all, of Mr. McIntosh (now dead), on certain subjects, including, most prominently, on the subject of what was in Respondent's mind on certain subjects. For example, Respondent was questioned by his counsel:

Q. *Would Mr. McIntosh have been in a position to testify as to whether or not you had intent to circumvent the law* and to receive fund-raising illegally in the year 2002 through the Minorities Committee?

A. Mr. McIntosh would have been very aware to testify as to any of these allegations as to this respect. (N.T. 83–84).

Q. Judge DeLeon, during that time period, did you and Mr. McIntosh discuss any activities between you and the Minority Committee?

A. No, not at all.

Q. *Was he aware, though, in terms of your involvement or lack of involvement with the Minority Committee?*

A Yes. (N.T. 92).

The questions arise: (a) How is Mr. McIntosh competent to testify as to what was in DeLeon's mind regarding an "intent to circumvent the law?" Did DeLeon tell him: "I don't intend to violate the law?" (b) How would DeLeon know what McIntosh was "aware of"?—especially that McIntosh was aware that DeLeon had a "lack of involvement" with the Minorities

Committee? Did DeLeon tell him: "I'm not involved with the Minorities Committee?" Remember that DeLeon is claiming that he [DeLeon] knew nothing about the Committee, even of its existence, until after the first fund raiser in July 2002. (Complaint paragraph 20). (N.T. 108).

Respondent was then asked:

Q. Could he have confirmed your testimony that you were not involved with the Minority Committee in terms of raising money or hoping to raise money?

A. Yes, he could. He could do so through his testimony as well as the testimony of two other people that he spoke to.

Because of the fact that it was a statewide race, I had a campaign manager from Western Pennsylvania named Arky Turricelli (sic) and I also had a campaign manager in Central Pennsylvania named Jena East.

Both of them had conversation on the phone with Mr. McIntosh .... (N.T. 92–93).

Here, Respondent is testifying that he (Respondent) knew that Mr. McIntosh knew what Respondent was doing and what Respondent was "hoping"—and that Mr. McIntosh knew it because of what other people told him. It seems to me that this is classic hearsay. *See,* Pa. Rules of Evidence, Rule 801.

Similarly, with respect to Jena East,[16] another of the deceased witnesses, Respondent testified that he was prejudiced because she could have and would have testified that:

---

**15.** The three individuals whose deaths deprived the Respondent of the supposed benefit of their testimony, thus causing the prejudice he here alleges, were never identified by Respondent as witnesses who could provide any information relating to the Board's investigation. (N.T. 72–74).

**16.** Respondent's Harrisburg campaign manager.

A. ... And she had a lot she could tell this Court as to my demeanor during the year 2002, as to what she knew about me in the year 2002, and also my demeanor in 2001 and 2003.

She could vouch for me as to everything that I'm saying as being true, *that I did not know that my name had anything to do with that Minority Committee,* and that we were totally surprised when it came out that it did. (N.T. 97).

As in the case of Mr. McIntosh, Respondent's testimony is that he knew that she knew that he did not know that his name had anything to do with the Minority Committee. As in the case of Mr. McIntosh, this is an amazing accomplishment, but it is not admissible.

One more example. Respondent testified that his prejudice resulted from the deaths of three witnesses—Mr. McIntosh, Ms. East and one Arky Turrizis.[17] According to Respondent, Mr. Turrizis would have testified:

A. ... And in 2002, during some of these events, people did offer money for my campaign. And Arky, if he was here—he is now deceased— *he would say that we never received a single penny,* that we told the people we cannot raise money in the year 2002, that we could only start raising money in the year 2003. (N.T. 94).

The question here is the worth of this testimony and concomitantly the prejudice (if any) Respondent suffers by his inability to produce the witness now, after his death, and place his testimony in the record. Consider that, at the trial of this case, the Judicial Conduct Board, accord-ing to the allegations of the Complaint, would be placing in evidence public records and other documents establishing:

1. that during 2002[18] the Minorities Committee—actually the "Committee for Minorities on the Supreme Court" *did receive* campaign funds. (Complaint paragraphs 15–36). We can expect that the bank records and checks would be placed in the record.

2. that on June 21, 2002 a Political Committee Registration Statement dated May 30, 2002, was filed with the Department of State, Bureau of Commissions, Elections and Legislation on behalf of the "Committee for Minorities on the Supreme Court" and that document contained a page entitled "Authorization for a Political Committee to Receive Funds on Behalf of a Candidate" listing Respondent as the candidate authorizing the receipt of funds and containing a signature which spells "James M. DeLeon." (Complaint paragraph 14). We can expect that this official public record would be placed in the record.

3. that the above Registration Statement was prepared and filed by Linda Carter, Respondent's longtime personal secretary. (Complaint paragraph 10). We can expect that this official public record would be placed in the record.

4. that the said Registration Statement listed Arian DeLeon, Respondent's daughter, as Chairman of the Committee. (Complaint paragraph 11). We can expect that this official public record would be placed in the record.

5. that the said Registration Statement listed Jermaine DeLeon, Respon-

---

17. Respondent's Western Pennsylvania campaign manager.

18. 2002 is the year of interest in this case because any funds raised during that year would have been raised earlier than permitted by Canon 7.

dent's son, as Treasurer of the Committee. (Complaint paragraph 12). We can expect that this official public record would be placed in the record.

6. that on June 17, 2002 Respondent's son opened a checking account at PNC Bank for the Minorities Committee and made an initial deposit of $2,600. (Complaint paragraph 15). We can expect that PNC Bank records and the checks would be placed in the record.

7. that numerous checks deposited in the Minorities Committee bank account were payable to Respondent personally as well as to the "DeLeon Committee." (Complaint paragraph 28). We can expect that the PNC Bank records and the checks would be placed in the record.

The point is that, even if Messrs. McIntosh and Turrizis and Ms. East were alive and available at the trial, and even if their testimony that Respondent knew nothing about the Minorities Committee would have been admissible, the Court would assess that testimony under a much brighter light than was possible at the preliminary hearing of May 22, 2006: it would assess that testimony in the context of all of the evidence, including that of the Judicial Conduct Board. At such a trial, if Judge DeLeon's defense was—as he has certainly indicated it would be—that he didn't know anything about the Minorities Committee, in the face of the documentary evidence set out above, it is entirely likely the testimony of Mr. McIntosh, Ms. East and Mr. Turrizis would not even be offered. If there is truth to that, then there is no prejudice to Respondent caused by the present unavailability of these witnesses.

Furthermore, I am at a loss to see how Respondent is prejudiced by the loss of the testimony of Mr. Turrizis, the Western Pennsylvanian, testifying from Pittsburgh, that "we never received a single penny"— in a bank account *in Philadelphia*—about which there is no evidence Turrizis had anything to do with, or even knew about.

It is my conclusion that Respondent did not establish actual prejudice, and I respectfully dissent from the majority's finding that he did.